LAW OFFICES

# LEYDIG, VOIT & MAYER, LTD.

A PROFESSIONAL CORPORATION

TWO PRUDENTIAL PLAZA, SUITE 4900

CHICAGO, ILLINOIS 60601-6780

(312) 616-5600

FACSIMILE: (312) 616-5700

WWW.LEYDIG.COM

July 27, 2005

JAMES B. MUSKAL
DENNIS R. SCHLEMMER
GORDON R. COONS
JOHN W. KOZAK
MARK E. PHELPS
H. MICHAEL HARTMANN
BRUCE M. GAGALA
CHARLES H. MOTTIER
JOHN KILYK, JR.
ROBERT F. GREEN
JOHN B. CONKLIN
JAMES D. ZALEWA
MARK J. LISS
JOHN M. BELZ*
BRETT A. HESTERBERG
JEFFREY A. WYAND*
PAUL J. KORNICZKY
PAMELA J. RUSCHAU
STEVEN P. PETERSEN
JOHN M. AUGUSTYN
CHRISTOPHER T. GRIFFITH
WESLEY O. MUELLER
JEREMY M. JAY*
LYNN A. SULLIVAN
JEFFREY B. BURGAN
ELEY O. THOMPSON
MARK JOY
DAVID M. AIRAN
XAVIER PILLAI
Y. KURT CHANG
GREGORY C. BAYS
STEVEN H. SKLAR
TAMARA A. MILLER
M. DANIEL HEFNER
ANDREW J. HEINISCH**
JEFFREY J. MAKEEVER**
SALIM A. HASAN
ROGER D. WYLIE***
KENNETH P. SPINA

PHILLIP H. PIPPENGER
ANNE C. HAFFNIZGER**
VLADAN M. VASILJEVIC
CLAUDIA W. STANGLE
KEVIN L. WINGATE**
PAUL J. FILBIN
JOHN L. GASE
JEREMY C. LOWE
JOHN T. BRETSCHER
ROBERT T. WITTMANN
SHANNON D. SCHENCK*
ANDREW M. ALUL
J. KARL GROSS
SETH A. ROSE
SAUMIL S. MEHTA
JASON T. MURATA
SCOTT H. SCHULHOF
VICTOR L. SONG
AARON R. FEIGELSON
A WESLEY FERRECEE*
L. SCOTT BEALL
LAWRENCE E. CROWE**
LISA K. KELLY
STEPHEN R. AUTEN
MARK A. NIEDS
CAROLINE L. STEVENS
DOUGLAS A. ROBINSON
NANCY J. GETTEL
PETER H. DOMER
JEFFREY H. TURNER
SUSAN L. STEELE
STEPHANIE M. LAWLEY*+
KURT T. BUECHLE
WILLIAM H. DIETRICH**+
KEVIN C. PARKS
THOMAS K. McBRIDE, JR
JENNIFER H. DUK
MARCOS P. RIVAS+++

WASHINGTON OFFICE
700 THIRTEENTH STREET, N.W., SUITE 300
WASHINGTON, D.C. 20005-3960
(202) 737-6770
FACSIMILE: (202) 737-6776

ROCKFORD OFFICE
6815 WEAVER ROAD, SUITE 300
ROCKFORD, ILLINOIS 61114-8018
(815) 963-7661
FACSIMILE: (815) 963-7664

SEATTLE OFFICE
1420 FIFTH AVENUE, SUITE 2200
SEATTLE, WASHINGTON 98101-1346
(206) 521-5985
FACSIMILE: (206) 224-3557

OF COUNSEL
C. FREDERICK LEYDIG
THEODORE W. ANDERSON       JOHN E. ROSENQUIST
JOHN P. BUNDOCK, JR.*      CHARLES S. OSLAKOVIC**
BERTON SCOTT SHEPPARD      JOHN D. FOSTER*

TECHNICAL ADVISORS
HEATHER R. KISSLING        KRISTI A. CALVERT
KRISTEN J. HARRELL         DEREK W. BARNETT
MELISSA C. KOLOM           KATHLEEN M HELM-BYCHOWSKI
CARYN C. BORG-BREEN        FRANCIS J. KOSZYK
RACHEL J. MEJDRICH         ELIZABETH M. CROMPTON
JULIE J. HONG              JASON A. MILLER
RICHARD P. DODSON****

ALL RESIDENT IN CHICAGO EXCEPT AS NOTED
*RESIDENT IN WASHINGTON OFFICE        *ADMITTED IN WISCONSIN ONLY
**RESIDENT IN ROCKFORD OFFICE         **ADMITTED IN VIRGINIA ONLY
***RESIDENT IN SEATTLE OFFICE         ***ADMITTED IN MASSACHUSETTS ONLY

**VIA REGISTERED MAIL – RETURN RECEIPT REQUESTED**

Mr. Kenneth C. Frazier
Senior Vice President and General Counsel
Merck & Co., Inc.
One Merck Drive
P.O. Box 100
Whitehouse Station, NJ 08889-0100

     Re:    **Alendronate Sodium Tablets**
              **(5 mg, 10 mg, 35 mg, 40 mg and 70 mg)**

Dear Merck:

     We are writing on behalf of Watson Laboratories, Inc. ("Watson"), pursuant to 21 U.S.C. § 355(j)(2)(B)(ii), to inform you that, in order to obtain approval to engage in the commercial manufacture, use or sale of alendronate sodium tablets (5 mg, 10 mg, 35 mg, 40 mg and 70 mg), Watson submitted to the United States Food and Drug Administration ("FDA") an Abbreviated New Drug Application ("ANDA") under 21 U.S.C. § 355(j)(1) and (2)(A), which contains data from bioavailability or bioequivalence studies. This application has been assigned ANDA Number 76-768 ("the Application").

     The Application, which includes a Paragraph IV certification, indicates that Watson intends to market its alendronate sodium tablets (5 mg, 10 mg, 35 mg, 40 mg and 70 mg) before the expiration of the following U.S. patents:

Mr. Kenneth C. Frazier
July 27, 2005
Page 2

    U.S. Patent 5,358,941;
    U.S. Patent 5,681,590;
    U.S. Patent 5,849,726;
    U.S. Patent 6,008,207;
    U.S. Patent 6,090,410;
    U.S. Patent 6,194,004 (10 mg only);
    U.S. Patent 5,994,329 (35 mg and 70 mg only);
    U.S. Patent 6,015,801 (35 mg and 70 mg only); and
    U.S. Patent 6,225,294 (35 mg and 70 mg only).

The Application further certifies that, in Watson's opinion and to the best of its knowledge, the '941, '590, '726, '207, '410, '004, '329, '801 and '294 patents are invalid, unenforceable and/or will not be infringed by the commercial manufacture, use, or sale of Watson's alendronate sodium tablets before their expiration. As required by 21 U.S.C. § 355(j)(2)(B)(ii), a detailed statement of the factual and legal basis upon which Watson bases its opinion is set forth below.

    In sum, Watson's alendronate sodium tablets do not contain one or more of the excipients as required by the '941, '590, '410 and '004 patents, or anhydrous alendronate sodium as required by the '726 or '207 patents. Accordingly, Watson's alendronate sodium tablet formulations are substantially different from the compositions claimed in these patents and do not infringe the claims thereof either literally or under the doctrine of equivalents. Further, the '329, '801 and '294 patents are either not infringed or invalid as obvious for the reasons set forth in Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc., 395 F.3d 1364 (Fed. Cir. 2005).

## I.    U.S. Patent 5,358,941 (Bechard et al. – Merck)

    The '941 patent entitled "Dry Mix Formulation For Bisphosphonic Acids With Lactose" issued on October 25, 1994, from U.S. Patent Application 09/984,399 filed on December 2, 1992. The '941 patent is assigned on its face to Merck & Co., Inc., and will expire on December 2, 2012 according to FDA's Orange Book. A six-month period for pediatric exclusivity on the '941 patent will expire June 2, 2013.

### A.    The Claims and Specification of the '941 Patent

    The '941 patent contains eight claims, two of which are independent. Independent claims 1 and 2 of the '941 patent recite as follows:

    1.    A pharmaceutical composition comprising by weight, about 0.5 to 40% by weight of an active ingredient selected from the group consisting of:

        4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
        N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
        4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid;
        3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid;

Mr. Kenneth C. Frazier
July 27, 2005
Page 3

> 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid;
> 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic
>     acid;
> 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; and
> 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine;

or a pharmaceutically acceptable salt thereof; and from about 60 to 99 5% by
weight of excipients consisting essentially of:

> anhydrous lactose; microcrystalline cellulose; croscarmallose sodium; and
> magnesium stearate.

2.     A pharmaceutical composition comprising by weight, about 0.5 to 40% by
weight of an active ingredient selected from the group consisting of:

> 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid;
> 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid;
> 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid;
> 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic
>     acid;
> 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; and
> 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine;

or a pharmaceutically acceptable salt thereof;

> about 10 to 80% by weight of anhydrous lactose;
> about 5 to 50% by weight of microcrystalline cellulose;
> about 0.5 to 10% by weight of croscarmallose sodium; and
> about 0.1 to 5% by weight of magnesium stearate.

The specification of the '941 patent (at col. 1) states that standard tablet formulations of
bisphosphonic acids such as alendronate have serious difficulties including discoloration,
instability and potency loss. Col. 1, lines 19-25. This degradation is believed to be due to a
reaction between the bisphosphonic acid and the excipient. Col. 1, lines 27-32. While the inert
diluent lactose may be avoided, it is "generally desirable" to use lactose in bisphosphonate tablet
formulations. Col. 1, lines 33-35. Accordingly, the invention of the '941 patent "solves this
problem by providing a tablet formulation and process therefore that avoid such interaction
between the bisphosphonic acid and the lactose in the formulation." Col. 1, lines 36-39. The
preferred diluents identified include lactose. Col. 2, lines 4-5. The specification further states
that "anhydrous lactose is preferred from the flow processing point of view, although hydrous
fast flow lactose may also be employed." Col. 2, lines 4-7.

Mr. Kenneth C. Frazier
July 27, 2005
Page 4

B.    Noninfringement of the '941 Patent

The claims of the '941 patent require the presence of a particular combination of excipients, specifically anhydrous lactose, microcrystalline cellulose, croscarmellose sodium and magnesium stearate, in a pharmaceutical composition. Watson's alendronate sodium tablets do not contain lactose in any amount either in an anhydrous form or otherwise. Moreover, Watson's alendronate sodium tablets do not contain croscarmellose sodium in any amount. The transitional phrase "consisting essentially of" in claim 1 further limits the claimed composition to only those excipients recited in the claim that do not impact the alleged novelty of claim 1. *See PPG Indus. v. Guardian Indus.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998). Watson's alendronate sodium tablets contain excipients not identified in list recited in claim 1 including, for example, mannitol. In sum, there is no literal infringement of claims 1-2 and claims 3-8 dependent thereon.

The doctrine of prosecution history estoppel further precludes the patentee from arguing that an equivalent of the excipient anhydrous lactose is present in Watson's alendronate sodium tablet formulations. In particular, the patentee is barred from asserting that mannitol or any other additive in Watson's formulations are equivalent to the anhydrous lactose limitation in the claims. During prosecution of the '941 patent, pending claims 9 and 10 (issued as claims 1 and 2) were narrowed to require the use anhydrous lactose. This narrowing of a preexisting claim limitation during prosecution gives rise to a presumption of surrender of equivalents pursuant to the Supreme Court decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002); *see Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1141 (Fed. Cir. 2004).

The presumption that the patentee has surrendered equivalents to the anhydrous lactose limitation in claims 1 and 2 can only be overcome if "[t]he equivalent [was] unforeseeable at the time of the application; the rationale underlying the amendment [bears] no more than a tangential relation to the equivalent in question; or there [was] some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Festo*, 535 U.S. at 740-71; *see Ranbaxy Pharms., Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1241 (Fed. Cir. 2003). The use of mannitol was foreseeable as explicitly recognized by the patentee during prosecution. *See* Amendment Under 37 C.F.R. § 1.111 dated July 26, 1993, at 6. Furthermore, the narrowing amendment that limited the excipient of interest to "anhydrous lactose" recited in the claims was made in direct response to the Examiner's obviousness rejection. *See* Response to Final Rejection dated February 14, 1994, at 1-2. Finally, no other reason exists that prevented the patentee from describing the insubstantial substitute. The patentee is unable to demonstrate that "at the time of the amendment one skilled in the art could not reasonable be expected to have drafted a claim that would have literally encompassed the alleged equivalent." *Festo*, 535 U.S. at 741.

The patentee's statements during prosecution of the '941 patent further bars infringement under the doctrine of equivalents. The patentee repeatedly stressed the importance of lactose in the pharmaceutical formulations of the invention. For example, the patentee distinguished the

Mr. Kenneth C. Frazier
July 27, 2005
Page 5

prior art Margolis reference by stating that it does not describe the use of lactose and even teaches away from other diluents including mannitol:

> [N]othing in Margolis indicates that lactose is a preferred diluent. Moreover, Margolis <u>does not even disclose the use of anhydrous lactose or fast flow lactose</u>. Thus, Margolis would have actually taught away from the claimed invention by suggesting that other diluents such as starch, dicalcium phosphate, calcium sulfate, kaolin, <u>mannitol</u> and powdered sugar) could be successfully employed in place of lactose.

Amendment Under 37 C.F.R. § 1.111 dated July 26, 1993, at 6 (emphasis added). The patentee subsequently argued that the lactose limitation in the pending process claims (that were subsequently cancelled) were "critical aspects". Amendment dated November 10, 1993, at 2. The use of a dry-mix formulation prepared by direct compression (apparently containing lactose) was also stated to have "surprising" stability over wet-granulation formulations that lost potency under accelerated conditions. *Id.*; col. 5-6 (Example 4). This stability data was specifically relied upon by the Examiner in allowing the claims. *See* Response to Final Rejection dated February 14, 1994, at 2.

Moreover, even if prosecution history estoppel does not apply, there is no infringement under the doctrine of equivalents. The '941 patent specification explicitly states that the use of lactose is desirable in the bisphosphonate formulations. Col. 1, lines 33-35. The only diluents described in the '941 patent is lactose. In fact, the particular alendronate tablets set forth in Examples 1-3 (at col. 4-5) contain anhydrous lactose as the diluent. Thus, Watson's alendronate sodium tablets that do not contain lactose in any form, but instead contain mannitol, cannot infringe under the doctrine of equivalents. Otherwise, the "anhydrous lactose" limitation in the claims of the '941 patent would be entirely vitiated. *See Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1331 (Fed. Cir. 2003) (noting that the doctrine of equivalents cannot be used to vitiate a claim limitation altogether in contravention of the "all-elements" rule).

## II.    U.S. Patent 5,681,590 (Bechard et al. – Merck)

The '590 patent entitled "Dry Mix Formulation For Bisphosphonic Acids" issued on October 28, 1997, from U.S. Patent Application 09/454,100 that is the U.S. national phase counterpart of PCT Application PCT/US93/11172 filed on November 17, 1993. This PCT application is a continuation of the '941 patent. The '590 patent is assigned on its face to Merck & Co., Inc., and will expire on December 2, 2012 according to FDA's Orange Book. A six-month period for pediatric exclusivity on the '590 patent will expire June 2, 2013.

### A.    The Claims and Specification of the '590 Patent

The '590 patent contains seventeen claims. However, for purposes of Watson's Paragraph IV certification, only claims 8-15 and 17 of the '590 patent are relevant. Claims 1-7 and 16 of the '590 patent are directed to <u>processes</u> for preparing tablet formulations.

Mr. Kenneth C. Frazier
July 27, 2005
Page 6

Accordingly, no Paragraph IV certification with respect to claims 1-7 and 16 is required under 21 U.S.C. § 355(j)(2)(A)(vii)(IV).

Claims 8-10 and 17 of the '590 patent recite as follows:

8.    A solid dosage form containing an active ingredient selected from the group consisting of:

> 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid;
> 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid;
> 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid;
> 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic
>     acid;
> 1-hydroxy-2-›3-pyridyl!ethylidene-1,1-bisphosphonic acid; and
> 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine;
> or a pharmaceutically acceptable salt thereof;

wherein the dosage form is prepared by the process of claim 1.

9.    A pharmaceutical composition comprising by weight, about 0.5 to 40% by weight of an active ingredient selected from the group consisting of:

> 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid;
> 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid;
> 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bis-phosphonic acid;
> 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic
>     acid;
> 1-hydroxy-2-›3-pyridyl!ethylidene-1,1-bisphosphonic acid; and
> 4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine;
> or a pharmaceutically acceptable salt thereof;

and from about 60 to 99.5% by weight of excipients consisting essentially of: hydrous fast flow lactose; microcrystalline cellulose; croscarmellose sodium; and magnesium stearate.

10.    A pharmaceutical composition comprising by weight, about 0.5 to 40% by weight of an active ingredient selected from the group consisting of:

> 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;

Mr. Kenneth C. Frazier
July 27, 2005
Page 7

    4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid;
    3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid;
    3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid;
    1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic
        acid;
    1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; and
    4-(hydroxymethylene-1,1-bisphosphonic acid)piperidine;
    or a pharmaceutically acceptable salt thereof;

about 10 to 80% by weight of hydrous fast flow lactose;
about 5 to 50% by weight of microcrystalline cellulose;
about 0.5 to 10% by weight of croscarmallose sodium; and
about 0.1 to 5% by weight of magnesium stearate.

17.    A solid dosage form containing as active ingredient a basic nitrogen containing bisphosphonate wherein the dosage form is prepared by the process of claim 1.

The '590 patent is a continuation of the '941 patent and, therefore, the specifications of these two patents should be identical. However, the '590 patent specification appears to contain additional subject matter, in particular the description of 2.5 mg, 10 mg and 50 mg alendronate tablets in Examples 2-4 (col. 5) as well as the stability study in Example 7 (col. 6-7).

    B.    Noninfringement of the '590 Patent

Claims 8 and 17 of the '590 patent are product-by-process claims. If claims 8 and 17 are interpreted to be limited to the recited process steps, these claims are not infringed by Watson's alendronate sodium tablets either literally or under the doctrine of equivalents.

The process steps recited in claims 8 and 17 (by reference to claim 1) require that the diluent used by selected from anhydrous lactose and hydrous fast flow lactose. The only diluent present in Watson's alendronate sodium tablets is mannitol. No lactose is added in any form and certainly not either anhydrous lactose or hydrous fast flow lactose. Moreover, the process for producing tablets set forth in claim 1 is a direct compression of the mixture of the bisphosphonate active ingredient and required excipients. In contrast, the preparation of Watson's alendronate sodium tablet formulations does not use the required direct compression step recited in claim 1. Instead, a wet-granulation process is employed to make Watson's tablets. Therefore, Watson does not literally infringe claims 8 and 17 of the '590 patent.

As a threshold matter, the patentee is barred from even asserting that Watson's alendronate sodium tablets infringe under the doctrine of equivalents in view of certain statements during prosecution of the '590 patent. For example, in seeking to overcome the Examiner's obviousness rejection, the patentee pointed out that the prior art wet granulation process is different from the claimed direct compression process. *See* Response to Office Action

Mr. Kenneth C. Frazier
July 27, 2005
Page 8

dated January 23, 1997, at 2. The patentee noted that, as evidenced by Example 7 (mistakenly referred to as Example 4), the process of the '590 patent yields improved stability and no discoloration. *Id.* Claims 8 and 17 were subsequently allowed by the Examiner for the following reason: "As shown in the specification, the tablets made by the process of claim 1 [referenced in issued claims 8 and 17] do not become discolored even after 4 weeks as do tablets made by the process of Isomura, i.e. wet granulation." Notice of Allowability dated April 15, 1997, at 2. In view of these comments, the patentee is precluded from alleging that Watson's alendronate sodium tablets prepared by a wet granulation process infringe claims 8 and 17 under the doctrine of equivalents.

Moreover, Watson's alendronate sodium tablets are prepared by a substantially different process than the process required by claims 8 and 17. A wet granulation procedure is used by Watson to manufacture its tablets, not direct compression. The doctrine of equivalents cannot be used to vitiate a claim limitation altogether in contravention of the "all-elements" rule (assuming that the recited process steps are indeed limitations). *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1331 (Fed. Cir. 2003). Direct compression is a key advantage of the claimed invention according to the background of the '590 patent: "[T]he present invention also provides a processing advantage since it requires only blending of the ingredients without granulation or addition of water prior to compression." Col. 1, lines 42-45. In Example 7, alendronate tablets prepared by direct compression purportedly exhibited superior stability to wet granulation tablets. Col. 6-7. Because Watson's alendronate sodium tablets are not prepared by the direct compression process required by claims 8 and 17, there is no infringement under the doctrine of equivalents.

Claims 9 and 10 of the '590 patent are likewise not infringed literally or under the doctrine of equivalents by Watson's alendronate sodium tablets. Claims 9 and 10 cover pharmaceutical formulations that require a particular combination of excipients, specifically hydrous fast flow lactose, microcrystalline cellulose, croscarmellose sodium and magnesium stearate, in a pharmaceutical composition. Watson's alendronate sodium tablets do not contain lactose in any amount either in a hydrous fast flow form or otherwise. Moreover, Watson's alendronate sodium tablets do not contain croscarmellose sodium in any amount. The transitional phrase "consisting essentially of" in claim 9 further limits the claimed composition to only those excipients recited in the claim that do not impact the alleged novelty of claim 1. *See PPG Indus. v. Guardian Indus.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998). Watson's alendronate sodium tablets contain excipients not identified in list recited in claim 9 and 10 including, for example, mannitol. Accordingly, there is no literal infringement of claims 9-10 and claims 11-15 dependent thereon.

As noted above with respect to claims 8 and 17, prosecution history estoppel precludes the patentee from asserting that Watson's alendronate sodium tablets infringe claims 9 and 10 under the doctrine of equivalents. The improved stability of the claimed pharmaceutical formulations containing the recited excipients, including hydrous fast flow lactose, was asserted by the patentee during prosecution and was relied on by the Examiner in allowing claims 9 and 10. *See* Response to Office Action dated January 23, 1997, at 2; Notice of Allowability dated

Mr. Kenneth C. Frazier
July 27, 2005
Page 9

April 15, 1997, at 2. Prosecution history estoppel from the parent '941 patent also applies to prevent the patentee from asserting that an equivalent to the hydrous fast flow lactose is present in Watson's alendronate sodium tablets. *See Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291-92 (Fed. Cir. 1995). Further, Watson's alendronate sodium tablets do not infringe claims 9 and 10 of the '590 patent under the doctrine of equivalents even if there is no estoppel. Otherwise, the "hydrous fast flow lactose" limitation in these claims of the '941 patent would be entirely vitiated. *See Abbott Labs v. Novopharm Ltd.*, 323 F.3d 1324, 1331 (Fed. Cir. 2003) (noting that the doctrine of equivalents cannot be used to vitiate a claim limitation altogether in contravention of the "all-elements" rule).

## III.    U.S. Patent 5,849,726 (Brenner et al. – Merck)

The '726 patent entitled "Anhydrous Alendronate Monosodium Salt Formulations" issued on December 15, 1998, from U.S. Patent Application 09/973,386 that is the U.S. national phase counterpart of PCT Application PCT/US96/08284 filed on June 3, 1996. The '726 patent is a continuation of U.S. Patent Application 09/469,143 filed on June 6, 1995. The '726 patent is assigned on its face to Merck & Co., Inc. and will expire on June 6, 2015 according to FDA's Orange Book. A six-month period for pediatric exclusivity on the '726 patent will expire December 6, 2015.

### A.    Claims and Specification of the '726 Patent

The '726 patent contains seven claims, all of which require the anhydrous form of alendronate monosodium. Independent claims 1 and 7 recite as follows:

> 1.    A pharmaceutical composition comprising a pharmaceutically effective amount of anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt in a pharmaceutically acceptable carrier.

> 7.    The anhydrous form of 4-amino-1-hydroxybutylidene- 1,1-bisphosphonic acid monosodium salt.

The specification of the '726 patent concedes that alendronate monosodium trihydrate is previously described in the art including, for example, in U.S. Patent 4,922,007. Col. 1, lines 45-51. New crystalline forms of alendronate are stated to be need "to enable ease of formulation and better pharmacokinetics" that will overcome the problem of gastric irritability associated with the administration of the free acid form of alendronate. Col. 1, lines 53-60. The anhydrous form of alendronate sodium purportedly results in "substantially less gastric irritability" when administered to a human patient. Col. 2, lines 4-8.

### B.    Noninfringement of the '726 Patent

The claims of the '726 patent require the anhydrous form of alendronate monosodium. In contrast, Watson's alendronate sodium tablets contain alendronate sodium trihydrate. This

Mr. Kenneth C. Frazier
July 27, 2005
Page 10

trihydrate form of alendronate is the prior art crystalline form that is expressly distinguished from the claimed anhydrous form in the '726 patent specification. See col. 1, lines 45-52. Accordingly, there is no literal infringement of the claims of the '726 patent.

The doctrine of prosecution history estoppel further precludes the patentee from arguing that the trihydrate form of alendronate sodium present in Watson's alendronate sodium tablet formulations is equivalent to the anhydrous form. During prosecution of the '726 patent, the patentee explicitly distinguished the claimed anhydrous form of alendronate from the prior art including, in particular the '077 patent. See Response dated July 20, 1998, at 2-3. In view of these arguments, the patentee is precluded from alleging that Watson's alendronate sodium tablets containing the trihydrate form does not infringe the claims of the '726 patent under the doctrine of equivalents. The doctrine of equivalents cannot be used to vitiate a claim limitation altogether in contravention of the "all-elements" rule (assuming that the recited process steps are indeed limitations). *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1331 (Fed. Cir. 2003).

**IV.    U.S. Patent 6,008,207 (Brenner et al. – Merck)**

The '207 patent entitled "Anhydrous Alendronate Monosodium Salt Formulations" issued on December 28, 1999, from U.S. Patent Application 09/133,200 filed on August 13, 1998. The '200 application claims priority (as a continuation of a continuation) to an application filed on June 6, 1995. The '207 patent is assigned on its face to Merck & Co., Inc. and will expire on June 6, 2015 according to FDA's Orange Book. A six-month period for pediatric exclusivity on the '726 patent will expire December 6, 2015.

    A.    Claims and Specification of the '207 Patent

The '207 patent contains four claims, all directed to methods of administering anhydrous 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid monosodium salt. The claimed methods include treating bone resorption (claim 1), preventing bone resorption (claim 2), inhibiting both resorption (claim 3) and promoting bone growth (claim 4). The '207 appears to have the same specification as the '726 patent.

    B.    Noninfringement of the '207 Patent

The claims of the '207 patent require the administration of the anhydrous form of alendronate monosodium. In contrast, Watson's alendronate sodium tablets contain alendronate sodium trihydrate. This trihydrate form of alendronate is the prior art crystalline form that is expressly distinguished from the claimed anhydrous form in the '726 patent specification. See col. 1, lines 46-52. Accordingly, there is no literal infringement of the claims of the '726 patent.

The doctrine of prosecution history estoppel further precludes the patentee from arguing that the trihydrate form of alendronate sodium present in Watson's alendronate sodium tablet formulations is equivalent to the anhydrous form. During prosecution of the parent '726 patent, the patentee explicitly distinguished the claimed anhydrous form of alendronate from the prior

Mr. Kenneth C. Frazier
July 27, 2005
Page 11

art including, in particular the '077 patent. *See* '726 patent, Response dated July 20, 1998, at 2-3. In view of these arguments, the patentee is precluded from alleging that Watson's alendronate sodium tablets containing the trihydrate form does not infringe the claims of '207 patent under the doctrine of equivalents. The doctrine of equivalents cannot be used to vitiate a claim limitation altogether in contravention of the "all-elements" rule (assuming that the recited process steps are indeed limitations). *Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1331 (Fed. Cir. 2003).

## V.    U.S. Patent 6,090,410 (Bechard et al. – Merck)

The '410 patent entitled "Dry Mix Formulation For Bisphosphonic Acids" issued on July 18, 2000, from U.S. Patent Application 09/141,782. The '410 patent is part of the same family as the '590 and '941 patents. The '410 patent is assigned on its face to Merck & Co., Inc., and will expire on December 2, 2012 according to FDA's Orange Book. A six-month period for pediatric exclusivity on the '410 patent will expire June 2, 2013.

### A.    The Claims and Specification of the '410 Patent

The '410 patent contains thirteen claims, three of which are independent. Independent claims 1, 2 and 12 of the '410 patent recite as follows:

> 1.    A pharmaceutical composition comprising from about 0.5 to 40% by weight of a bisphosphonic acid or a pharmaceutically acceptable salt thereof and from about 60% to 99.5% by weight of excipients, said excipients comprising a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant.

> 2.    A pharmaceutical composition comprising from about 0.5 to 40% by weight of a nitrogen containing bisphosphonic acid or a pharmaceutically acceptable salt thereof and from about 60% to 99.5% by weight of excipients, said excipients comprising a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant.

> 12.    A pharmaceutical composition comprising by weight about 0.5 to 40% by weight of an active ingredient selected from the group consisting of:

> > 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid; 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid; 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid; 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid; 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid; 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid; 4-(hydroxymethylene-1,1-bisphosphonic acid) piperidine; or a pharmaceutically acceptable salt

Mr. Kenneth C. Frazier
July 27, 2005
Page 12

> thereof; and from about 60% to 99.5% by weight of excipients comprising: a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant.

The '410 patent appears to have the same specification as the parent '941 patent.

B.   Noninfringement of the '410 Patent

The claims of the '410 patent all require, in relevant part, a diluent selected from the group consisting of "anhydrous lactose and hydrous fast flow lactose" as part of the excipients in the claimed pharmaceutical compositions. Watson's alendronate sodium tablets do not contain lactose in any amount either anhydrous or hydrous fast flow. Accordingly, there is no literal infringement of claims 1, 2 and 12 and claims 3-11 and 13 dependent thereon.

The doctrine of prosecution history estoppel further precludes the patentee from arguing that an equivalent of the diluent anhydrous lactose or hydrous fast flow lactose is present in Watson's alendronate sodium tablet formulations. In particular, the patentee is barred from asserting that mannitol or any other additive in Watson's formulations are equivalent to the anhydrous lactose limitation in the claims. During prosecution of the '410 patent, pending claims 19 and 20 (issued as claims 1 and 2) were narrowed to require the diluent must be "selected from the group consisting of anhydrous lactose and hydrous fast flow lactose." *See* Response And Amendment Under 37 C.F.R. § 1.111 dated September 23, 1999, at 1-3. This narrowing of a preexisting claim limitation during prosecution gives rise to a presumption of surrender of equivalents pursuant to the Supreme Court decision in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722 (2002); *see Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1141 (Fed. Cir. 2004).

The presumption that the patentee has surrendered equivalents to the "selected from the group consisting of anhydrous lactose and hydrous fast flow" limitation in claims 1 and 2 can only be overcome if "[t]he equivalent [was] unforeseeable at the time of the application; the rationale underlying the amendment [bears] no more than a tangential relation to the equivalent in question; or there [was] some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question." *Festo*, 535 U.S. at 740-71; *see Ranbaxy Pharms., Inc. v. Apotex, Inc.*, 350 F.3d 1235, 1241 (Fed. Cir. 2003). The use of mannitol was foreseeable as explicitly recognized by the patentee during prosecution of the parent '941 patent. *See* '941 patent, Amendment Under 37 C.F.R. § 1.111 dated July 26, 1993, at 6. Furthermore, the narrowing amendment that required the diluent of interest to be "selected from the group consisting of anhydrous lactose and hydrous fast flow lactose" was made in direct response to the Examiner's obviousness rejection. *See* Response And Amendment Under 37 C.F.R. § 1.111 dated September 23, 1999, at 1-3. Finally, no other reason exists that prevented the patentee from describing the insubstantial substitute. The patentee is unable to demonstrate that "at the time of the amendment one skilled in the art could not reasonable be expected to have drafted a claim that would have literally encompassed the alleged equivalent."

Mr. Kenneth C. Frazier
July 27, 2005
Page 13

*Festo*, 535 U.S. at 741. Claim 12 of the '410 patent contains the identical limitation set forth in claims 1 and 2 restricting the diluent to either anhydrous lactose or hydrous fast flow lactose. Accordingly, prosecution history estoppel precludes infringement under the doctrine of equivalents of claims 1, 2 and 12 and claims dependent thereon.

Prosecution history estoppel resulting from the parent '941 and '590 patents discussed similarly applies to prevent the patentee from asserting that an equivalent to the anhydrous lactose or hydrous fast flow lactose diluent is present in Watson's alendronate sodium tablets. *See Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.*, 66 F.3d 285, 291-92 (Fed. Cir. 1995).

Even if prosecution history estoppel does not apply (which it does), Watson's alendronate sodium tablets do not infringe the '410 patent and claims dependent thereon under the doctrine of equivalents. Otherwise, the "diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose" limitation in claims 1, 2 and 12 and dependent claims thereof of the '410 patent would be entirely vitiated. *See Abbott Labs. v. Novopharm Ltd.*, 323 F.3d 1324, 1331 (Fed. Cir. 2003) (noting that the doctrine of equivalents cannot be used to vitiate a claim limitation altogether in contravention of the "all-elements" rule).

## VI. U.S. Patent 6,194,004 (Bechard et al. – Merck)

The '004 patent entitled "Dry Mix Formulation For Bisphosphonic Acids" issued on February 27, 2001, from U.S. Patent Application 09/432,859. The '004 patent is part of the same family as the '410, '590 and '941 patents. The '410 patent is assigned on its face to Merck & Co., Inc., and will expire on December 2, 2012 according to FDA's Orange Book. A six-month period for pediatric exclusivity on the '004 patent will expire June 2, 2013.

### A.    The Claims and Specification of the '004 Patent

The '004 patent contains twenty-five claims, three of which are independent. Independent claims 1, 3 and 5 of the '004 patent recite as follows:

1.    A pharmaceutical composition comprising from about 0.5 to 40% by weight of a bisphosphonic acid or a pharmaceutically acceptable salt thereof and from about 60% to 99.5% by weight of excipients, said excipients comprising a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant, wherein said composition is coated.

3.    A pharmaceutical composition comprising from about 0.5 to 40% by weight of a nitrogen containing bisphosphonic acid or a pharmaceutically acceptable salt thereof and from about 60% to 99.5% by weight of excipients, said excipients comprising a diluent selected from the group consisting of anhydrous

Mr. Kenneth C. Frazier
July 27, 2005
Page 14

lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant, wherein said composition is coated.

12.    A pharmaceutical composition comprising by weight about 0.5 to 40% by weight of an active ingredient selected from the group consisting of:

> 4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> N-methyl-4-amino-1-hydroxybutylidene-1,1-bisphosphonic acid;
> 4-(N,N-dimethylamino)-1-hydroxybutylidene-1,1-bisphosphonic acid;
> 3-amino-1-hydroxypropylidene-1,1-bisphosphonic acid;
> 3-(N,N-dimethylamino)-1-hydroxypropylidene-1,1-bisphosphonic acid;
> 1-hydroxy-3-(N-methyl-N-pentylamino)propylidene-1,1-bisphosphonic acid;
> 1-hydroxy-2-[3-pyridyl]ethylidene-1,1-bisphosphonic acid;
> 4-(hydroxymethylene-1,1-bisphosphonic acid) piperidine;
> or a pharmaceutically acceptable salt thereof;

and from about 60% to 99.5% by weight of excipients, said excipients comprising a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose, a binder, a disintegrant, and a lubricant, wherein said composition is coated.

The specification of the '004 patent appears to be the same as the '410 and '941 patents.

### B.    Noninfringement of the '004 Patent

Independent claims 1, 3 and 5 of the '004 patent closely mirror claims 1, 2 and 13 of the '410 patent. The claims of the '004 patent all require the use of a diluent selected from the group consisting of anhydrous lactose and hydrous fast flow lactose. In addition, the claims of the '004 patent further require that the pharmaceutical compositions are coated. Watson's alendronate sodium tablets (10 mg) do not contain lactose in any form and are not coated. Accordingly, for all of the reasons discussed above with respect to the '004 patent as well as the absence of a coating, claims 1, 3 and 5 of the '004 patent and claims dependent thereon are not infringed either literally or under the doctrine of equivalents by Watson's alendronate sodium tablets (10 mg)

### VII.    U.S. Patent 5,994,329 (Daifotis et al. – Merck)

The '329 patent entitled "Method For Inhibiting Bone Resorption" issued on November 30, 1999, from U.S. Patent Application 09/134,214 (filed August 14, 1998) that is a continuation of PCT Application PCT/US98/14796 filed on July 17, 1998. The '329 patent further claims priority two U.S. provisional applications filed on July 22, 1997 and July 23, 1997. The '329 patent is assigned on its face to Merck & Co., Inc. and will expire on July 17, 2018 (for the

Mr. Kenneth C. Frazier
July 27, 2005
Page 15

claims thereof that are valid). A six-month period for pediatric exclusivity on the '329 patent
will expire on January 17, 2019.

A.     The Claims and Specification of the '329 Patent

The '329 patent contains 44 claims, four of which are independent, that generally relate
to methods for administering a bisphosphonate at a reduced-frequency dosing schedule including
once-weekly dosing. Claims 1-4 and 6-9 of the '329 patent generally relate to methods for
inhibiting bone resorption in a mammal by administering a bisphosphonate including alendronate
at a reduced-frequency dosing schedule that includes a dosing interval of once-weekly dosing.
Claims 16-19 and 21-23 generally relate to methods for treating osteoporosis at a dosing interval
that includes once-weekly dosing. Claims 30-33 and 35-37 are directed to methods for
preventing osteoporosis at this same reduced-frequency dosing schedule. Claim 44 relates to a
kit that contains a bisphosphonate for administration at a reduced-frequency dosing schedule
including once-weekly dosing. Claims 23 and 37 are representative and recite as follows (in
independent form incorporating all of the limitations in the dependent claims):

> 23.     A method for treating osteoporosis in human comprising orally
> administering about 70 mg of alendronate sodium trihydrate, on an alendronic
> acid bases, as a unit dosage according to a continuous schedule having a dosing
> interval of once-weekly.
>
> 37.     A method for preventing osteoporosis in human comprising orally
> administering about 35 mg of alendronate sodium trihydrate, on an alendronic
> acid bases, as a unit dosage according to a continuous schedule having a dosing
> interval of once-weekly.

The specification of the '329 patent states that prior osteoporosis treatments with small
daily doses of bisphosphonates cause adverse GI side-effects resulting from repetitive irrigation
to the GI tract. Col. 2, lines 65-67; col. 3, line 57 to col. 4, line 13. The reduced-frequency
dosing schedules described in the '329 patent decrease the irritating effect of the compounds as
well as increase patient compliance with the rigorous dosing instructions. Col. 3, lines 57-64;
col. 4, lines 14-23.

B.     Invalidity of the '329 Patent

As a threshold matter, the patentee is collaterally estopped from suing Watson for
infringement of any claim of the '329 patent. Under the doctrine of collateral estoppel, a
judgment of invalidity in one patent action renders the patent invalid in any subsequent action
based on the same patent. *See Blonder-Tongue Labs., Inc. v. University of Illinois Foundation*,
402 U.S. 313, 349 (1971); *Mycogen Plant Science, Inc. v. Monsanto Co.*, 252 F.3d 1306 (Fed.
Cir. 2001); *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373 (Fed. Cir. 1999).
Collateral estoppel applies to both asserted and nonasserted claims of infringement. *See Jarvis
B. Webb Co. v. Southern Sys., Inc.*, 742 F.3d 1388, 1399 (Fed. Cir. 1984); *Westwood Chem., Inc.*

Mr. Kenneth C. Frazier
July 27, 2005
Page 16

*v. United States*, 525 F.2d 1367, 1379-1380 (Ct. Cl. 1975). So long as the issues of invalidity are substantially identical such that the patentee had a full and fair opportunity to litigation the issue of validity, then collateral estoppel applies. *Westwood Chem.*, 525 F.2d at 1372.

Any differences between claims 23 and 37 that were held invalid in *Merck* and claims 1-4, 6-9, 16-19, 21-22, 30-33, 35-36 and 44 of the '329 patent are "so insubstantial that the issues of validity under Graham v. John Deere, must be considered to be the same." *Westwood Chem.*, 525 F.2d at 1380. Accordingly, the obviousness determination by the Federal Circuit regarding claims 23 and 37 cannot be relitigated against Watson as to these claims or the remaining claims of the '329 patent that are not substantially different.

Moreover, claims 1-4, 6-9, 16-19, 21-23, 30-33, 35-37 and 44 of the '329 patent are invalid as obvious under 35 U.S.C. § 103 in view of April 1996 *Lunar News* and July 1996 *Lunar News* articles for the reasons set forth in *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), *reh'g en banc denied*, 405 F.3d 1338 (Fed. Cir. 2005). The decision by the Federal Circuit in *Merck* applies to claims 23 and 37 as well as claims 1-4, 6-9, 16-19, 21-22, 30-33, 35-36 and 44 of the '329 patent.

A patent claim is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). The ultimate issue of obviousness turns on four factual determinations: (1) the scope and content of the prior art, (2) the level of ordinary skill in the art, (3) the differences between the claimed invention and the prior art, and (4) objective indicia of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

Turning to the third factor, there are significant similarities between the methods of claims 23 and 37, and the teachings of the two *Lunar News* articles. The Federal Circuit in *Merck* recognized these similarities:

> These claims, and the July 1996 article, both teach administering alendronate once a week instead of once a day. These claims read in light of the specification, and the July 1996 article, both indicate--and it has been conceded as known in the art at the time-- that for treating or preventing osteoporosis a once-weekly dosage at seven times the daily dose would be as effective as seven daily doses. The '329 patent, and both the April and July 1996 articles, explain the motivation for a once-weekly dose as increasing patient compliance, by making it easier to take the drug (and incur the inconvenience of the rigorous dosing regimen less frequently). Although the claims teach 70 or 35 mg doses rather than the 80 or 40 mg doses disclosed in the July 1996 article, Dr. Arthur C. Santora--one of the co-inventors on the '329 patent--admitted against Merck's interest that a once-weekly 40 mg dose would be as effective as seven daily 5 mg doses, and a once-weekly 80 mg dose would be as effective as seven daily 10 mg doses, in preventing or treating osteoporosis There was no great leap required of those

Mr. Kenneth C. Frazier
July 27, 2005
Page 17

skilled in the art to go from 40 or 80 mg once a week, the pills available at the
time to treat patients with Paget's disease, to a 35 or 70 mg pill once a week.

*Merck*, 395 F.3d at 1373 (citations omitted).

Importantly, the '329 patent does not provide any motivation to a person of ordinary skill
to overcome the purported adverse GI effect of esophageal injury caused by the administration of
alendronate beyond the motivation described in the two *Lunar News* articles. The court in *Merck*
concluded that there was no significant difference between the claimed invention and the two
*Lunar News* articles concerning the GI problem: "The '329 patent, both articles, and the
prevailing knowledge of those skilled in the art, recognized that to the extent 'dosing problems'
were related to repetitive irritation of the esophagus (from patients getting pills stuck in their
throats), taking fewer pills each week could reduce the attending GI problems." *Id.* at 1373-74.
Similarly, any claim of non-obviousness cannot be supported by the alleged reduction of GI side-
effects related to the size of the dose. On this point, the Federal Circuit in *Merck* stated as
follows:

> Neither the '329 patent nor the *Lunar News* articles explain how a higher once-
> weekly dosing regimen would avoid this set of dose-related adverse side effects.
> The '329 patent sets forth no human clinical or laboratory data showing the safety
> and tolerability of the treatment methods claimed by the patent. The only data
> provided in the '329 patent was generated in beagles, an experiment discredited at
> trial and disregarded by the district court in its decision. So while the district
> court may be correct in finding the *Lunar News* articles may have invited
> skepticism based on concerns for dose-related GI problems, the claimed invention
> adds nothing beyond the teachings of those articles.

*Id.* at 1374.

With respect to the first factor in the obviousness analysis (i.e., scope and content of the
prior art), the *Lunar News* articles disclose the weekly dosing schedule claimed in the '329
patent. The disclosure in these prior art references is nearly identical to the methods of claims 23
and 37. The minor difference in dosages does not render the claims nonobvious as the Federal
Circuit explained:

> [I]n this case the *Lunar News* articles contain the relevant teaching of the weekly
> dosing claimed in the '329 patent. The 'specific combination' of elements in
> claims 23 and 37 differs from the disclosure in the *Lunar News* articles only in
> terms of a minor difference in the dosage; without this difference, the *Lunar
> News* articles would anticipate claims 23 and 37 under section 102. For the *Lunar
> News* articles to render claims 23 and 37 obvious, the district court need only have
> found a suggestion or motivation to modify the dosages from those in the articles
> to those in the claims. But as noted above, Merck's own inventors admit the
> difference in dosing amount is obvious. If anything, concern over dosing amount

Mr. Kenneth C. Frazier
July 27, 2005
Page 18

suggests lowering the weekly dosage--from 80 to 70 mg, and from 40 to 35 mg,
just as Merck did.

*Id.* at 1375 (citations omitted). Accordingly, the motivation to combine the prior art *Lunar News*
articles to yield the claimed methods clearly existed prior to the filing of the '329 patent.

The secondary considerations of non-obviousness, the fourth factor under § 103, does not
support the patentability of the methods of claims 23 and 37. Any commercial success of
Merck's once-week dosing schedule for Fosamax® is not relevant. That is, it view of Merck's
'077 patent as well as its New Chemical Entity exclusivity, Merck could (and did) exclude others
from practicing the claimed once-weekly dosing schedule. "Because market entry by others was
precluded on those bases, the inference of non-obviousness of weekly-dosing, from evidence of
commercial success, is weak." *Id.* at 1377. Accordingly, commercial success does not support a
patentable distinction of claims 23 and 37 from the *Lunar News* articles that also describe once-
weekly dosing of alendronate. *Id.*

In sum, as held by the Federal Circuit in *Merck*, the Graham factors establish that claims
23 and 37 of the '329 patent are obvious in view of the April 1996 and July 1996 *Lunar News*
articles. The obviousness analysis set forth above also applies to claims 1-4, 6-9, 16-19, 21-22,
30-33, 35-36 and 44 of the '329 patent. Many of these claims are broader than claims 23 and 37,
specifically claims 16-19, 21-22, 30-33 and 35-36 upon which claims 23 and 37 depend. None
of claims 1-4, 6-9, 16-19, 21-22, 30-33, 35-36 and 44 contain limitations beyond those set forth
in claims 23 and 37 that would somehow render the claims nonobvious over the disclosure of
once-weekly dosing regimens of alendronate in the *Lunar News* articles.

C.    Noninfringement of the '329 Patent

Claims 5, 10-15, 20, 24-29, 34 and 38-43 of the '329 patent do not cover Watson's
alendronate sodium tablets (35 mg and 70 mg) or the method by which they will be
administered. For example, claims 5, 20 and 34 require the use of the bisphosphonate
risedronate as the active ingredient, not alendronate. Moreover, Watson only seeks approval for
the administration of alendronate sodium tablets (35 mg and 70 mg) on a once-weekly basis (as
with Merck's Fosamax®) and not for the dosing intervals of twice-weekly, biweekly and twice-
monthly recited in claims 10-15, 24-29 and 38-43. Moreover, claims 27 and 39 are directed to
tablet strengths containing 140 mg and 17.5 mg, respectively, of alendronate monosodium
trihydrate that are not the subject of Watson's ANDA. Thus, Watson's alendronate sodium
tablets (35 mg and 70 mg) do not infringe claims 5, 10-15, 20, 24-29, 34 and 38-43 of the '329
patent either literally or under the doctrine of equivalents.

Mr. Kenneth C. Frazier
July 27, 2005
Page 19

## VIII.   U.S. Patent 6,015,801 (Daifotis et al. – Merck)

The '801 patent entitled "Method For Inhibiting Bone Resorption" issued on January 18, 2000, from U.S. Patent Application 09/134,214 (filed August 14, 1998) that is a continuation-in-part of PCT Application PCT/US98/14796 filed on July 17, 1998. The '801 patent further claims priority two U.S. provisional applications filed on July 22, 1997 and July 23, 1997. The '801 patent is assigned on its face to Merck & Co., Inc. and will expire on July 17, 2018 (for the claims thereof that are valid). A six-month period for pediatric exclusivity on the '801 patent will expire on January 17, 2019.

### A.    The Claims and Specification of the '801 Patent

The '801 patent contains 59 claims, four of which are independent, that generally relate to methods for administering a bisphosphonate, such as alendronate, at a reduced-frequency dosing schedule including once-weekly dosing. Independent claims 1 and 15 are representative and recite as follows:

> 1.    A method for treating a condition or disease state in a mammal, said disease state or condition selected from the group consisting of Paget's disease, abnormally increased bone turnover, periodontal disease, tooth loss, bone fractures, metastatic bone disease, hypercalcemia of malignancy, and multiple myeloma, said method comprising orally administering to said mammal a pharmaceutically effective amount of a unit dosage of a bisphosphonate according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

> 15.    A method for preventing a condition or disease state in a mammal in need thereof, said disease state or condition selected from the group consisting of Paget's disease, abnormally increased bone turnover, periodontal disease, tooth loss, bone fractures, metastatic bone disease, hypercalcemia of malignancy, and multiple myeloma, said method comprising orally administering to said mammal a pharmaceutically effective amount of a unit dosage of a bisphosphonate according to a continuous schedule having a dosing interval selected from the group consisting of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

The dependent claims of the '801 patent further restrict the claimed methods, for example, to particular unit dosages, active ingredients, and dosage strengths.

The specification of the '801 patent states that prior osteoporosis treatments with small daily doses of bisphosphonates cause adverse GI side-effects resulting from repetitive irrigation to the GI tract. Col. 2, lines 61-67; col. 3, line 58 to col. 4, line 14. The reduced-frequency dosing schedules described in the '801 patent decrease the irritating effect of the compounds as

Mr. Kenneth C. Frazier
July 27, 2005
Page 20

well as increase patient compliance with the rigorous dosing instructions. Col. 3, lines 58-65;
col. 4, lines 15-24.

    B    Invalidity of the '801 Patent

    As a threshold matter, the patentee is collaterally estopped from suing Watson for
infringement of any claim of the '801 patent. Under the doctrine of collateral estoppel, a
judgment of invalidity in one patent action renders the patent invalid in any subsequent action
based on the same patent. *See Blonder-Tongue Labs., Inc. v. University of Illinois Foundation*,
402 U.S. 313, 349 (1971); *Mycogen Plant Science, Inc. v. Monsanto Co.*, 252 F.3d 1306 (Fed.
Cir. 2001); *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373 (Fed. Cir. 1999).
Collateral estoppel applies to both asserted and nonasserted claims of infringement. *See Jarvis
B. Webb Co. v. Southern Sys., Inc.*, 742 F.3d 1388, 1399 (Fed. Cir. 1984); *Westwood Chem., Inc.
v. United States*, 525 F.2d 1367, 1379-1380 (Ct. Cl. 1975). So long as the issues of invalidity are
substantially identical such that the patentee had a full and fair opportunity to litigation the issue
of validity, then collateral estoppel applies. *Westwood Chem.*, 525 F.2d at 1372.

    Any differences between claims 23 and 37 of the '329 patent that were held invalid in
*Merck* and claims 1-4, 6-8, 10, 15-18 and 20-22 of the '801 patent are "so insubstantial that the
issues of validity under *Graham v. John Deere*, must be considered to be the same." *Id.* at 1380.
Accordingly, the obviousness determination by the Federal Circuit regarding claims 23 and 37 of
the '329 patent cannot be relitigated against Watson as to these claims of the '801 patent that are
not substantially different.

    In addition, claims 1-4, 6-8, 10, 15-18 and 20-22 of the '801 patent are invalid as obvious
under 35 U.S.C. § 103 in view of April 1996 *Lunar News* and July 1996 *Lunar News* articles for
the reasons discussed above with respect to the '329 patent. These claims all encompass once-
weekly dosing schedules for alendronate just as claims 23 and 37 of the '329 patent. The
obviousness analysis set forth in *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d
1364 (Fed. Cir. 2005), *reh'g en banc denied*, 405 F.3d 1338 (Fed. Cir. 2005), applies to these
claims of the '801 patent. No additional limitations are present in claims 1-4, 6-8, 10, 15-18 and
20-22 of the '801 patent beyond those set forth in claims 23 and 37 of the '329 patent that would
somehow render these claims nonobvious over the disclosure of once-weekly dosing regimens of
alendronate in the *Lunar News* articles.

    C.    Noninfringement of the '801 Patent

    Claims 5, 9, 11-14, 19 and 23-59 of the '801 patent do not cover Watson's alendronate
sodium tablets (35 mg and 70 mg) or the method by which they will be administered. For
example, claims 5 and 19 require the use of the bisphosphonate risedronate as the active
ingredient, not alendronate. Moreover, Watson only seeks approval for the administration of
alendronate sodium tablets (35 mg and 70 mg) on a once-weekly basis (as with Merck's
Fosamax®) and not for the dosing intervals of twice-weekly, biweekly and twice-monthly
recited in claims 9 and 11-14. Claims 23-59 are directed to methods for treating a condition or

Mr. Kenneth C. Frazier
July 27, 2005
Page 21

state by administering a unit dosage of a histamine H2 receptor blocker and a unit dosage of a bisphosphonate. Accordingly, Watson's alendronate sodium tablets (35 mg and 70 mg) do not infringe claims 5, 9, 11-14, 19 and 23-59 of the '801 patent either literally or under the doctrine of equivalents.

IX.    **U.S. Patent 6,225,294 (Daifotis et al. – Merck)**

The '294 patent entitled "Method For Inhibiting Bone Resorption" issued on May 1, 2001, from U.S. Patent Application 09/440,577 (filed November 15, 1999) that is a continuation of the '329 patent that, in turn, is a continuation of PCT Application PCT/US98/14796 filed on July 17, 1998. The '294 patent further claims priority two U.S. provisional applications filed on July 22, 1997 and July 23, 1997. The '294 patent is assigned on its face to Merck & Co., Inc. and will expire on July 17, 2018 (for the claims thereof that are valid). A six-month period for pediatric exclusivity on the '294 patent will expire on January 17, 2019.

A.    The Claims and Specification of the '294 Patent

The '294 patent contains 94 claims, two of which are independent, that generally relate to kits containing a unit dosage of a bisphosphonate for administration according to a reduced-frequency schedule including once-weekly dosing. Independent claims 1 and 39 of the '294 patent recite as follows:

> 1.    A kit comprising at least one pharmaceutically effective unit dosage of a bisphosphonate selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof, for oral administration to a mammal according to a continuous dosing schedule having a dosing interval of once-weekly dosing, twice-weekly dosing, biweekly dosing, and twice-monthly dosing.

> 39.    A kit comprising at least one pharmaceutically effective unit dosage of a bisphosphonate selected from the group consisting of alendronate, cimadronate, clodronate, tiludronate, etidronate, ibandronate, risedronate, piridronate, pamidronate, zoledronate, pharmaceutically acceptable salts or esters thereof, and mixtures thereof, for oral administration to a mammal according to a continuous dosing schedule having a dosing interval of once-weekly dosing.

The dependent claims of the '294 patent further restrict the claimed kit, for example, to particular unit dosages, active ingredients, and dosage strengths. The specification of the '294 patent appears to be the same as the '329 patent.

Mr. Kenneth C. Frazier
July 27, 2005
Page 22

B.     Invalidity of the '294 Patent

As a threshold matter, the patentee is collaterally estopped from suing Watson for infringement of any claim of the '294 patent. Under the doctrine of collateral estoppel, a judgment of invalidity in one patent action renders the patent invalid in any subsequent action based on the same patent. *See Blonder-Tongue Labs., Inc. v. University of Illinois Foundation*, 402 U.S. 313, 349 (1971); *Mycogen Plant Science, Inc. v. Monsanto Co.*, 252 F.3d 1306 (Fed. Cir. 2001); *Pharmacia & Upjohn Co. v. Mylan Pharms., Inc.*, 170 F.3d 1373 (Fed. Cir. 1999). Collateral estoppel applies to both asserted and nonasserted claims of infringement. *See Jarvis B. Webb Co. v. Southern Sys., Inc.*, 742 F.3d 1388, 1399 (Fed. Cir. 1984); *Westwood Chem., Inc. v. United States*, 525 F.2d 1367, 1379-1380 (Ct. Cl. 1975). So long as the issues of invalidity are substantially identical such that the patentee had a full and fair opportunity to litigation the issue of validity, then collateral estoppel applies. *Westwood Chem.*, 525 F.2d at 1372.

Any differences between claims 23 and 37 of the '329 patent that were held invalid in *Merck* and claims 1-20 and 39-67 of the '294 patent are "so insubstantial that the issues of validity under Graham v. John Deere, must be considered to be the same." *Id.* at 1380. Accordingly, the obviousness determination by the Federal Circuit regarding claims 23 and 37 of the '329 patent cannot be relitigated against Watson as to these claims of the '294 patent that are not substantially different.

In addition, claims 1-20 and 39-67 of the '294 patent are invalid as obvious under 35 U.S.C. § 103 in view of April 1996 *Lunar News* and July 1996 *Lunar News* articles for the reasons discussed above with respect to the '329 patent. These claims all encompass once-weekly dosing schedules for alendronate just as claims 23 and 37 of the '329 patent. The obviousness analysis set forth in *Merck & Co., Inc. v. Teva Pharmaceuticals USA, Inc.*, 395 F.3d 1364 (Fed. Cir. 2005), *reh'g en banc denied*, 405 F.3d 1338 (Fed. Cir. 2005), applies to these claims of the '801 patent. No additional limitations are present in claims 1-20 and 39-67 of the '294 patent beyond those set forth in claims 23 and 37 of the '329 patent that would somehow render these claims nonobvious over the disclosure of once-weekly dosing regimens of alendronate in the *Lunar News* articles.

C.     Noninfringement of the '294 Patent

Claims 21-38 and 68-94 of the '294 patent do not cover Watson's alendronate sodium tablets (35 mg and 70 mg) or the method by which they will be administered. These claims all require the use of bisphosphonates other than alendronate that are not present in Watson's alendronate sodium tablets (35 mg and 70 mg). Accordingly, Watson's alendronate sodium tablets (35 mg and 70 mg) do not infringe claims 21-38 and 68-94 of the '329 patent either literally or under the doctrine of equivalents.

Mr. Kenneth C. Frazier
July 27, 2005
Page 23

**Conclusion**

In conclusion, as indicated above, there is no reasonable argument that the '941, '590, '726, '207, '410 and '004 patents would be infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Watson's alendronate sodium tablets (5 mg, 10 mg, 35 mg, 40 mg and 70 mg). Similarly, no reasonable argument exists that '239, '801 and '294 patents are invalid and/or would be infringed, either literally or under the doctrine of equivalents, by the manufacture, use or sale of Watson's alendronate sodium tablets (35 mg and 70 mg). Accordingly, no reasonable basis exists upon which a suit may be instituted against Watson as the result of the filing of its ANDA as the information provided herein makes clear.

Pursuant to 21 U.S.C. § 355(j)(5)(C)(i)(III), Watson provides an Offer of Confidential Access to relevant portions of Watson's ANDA 76-768 pursuant to a mutually agreeable confidentiality agreement that contains reasonable restrictions as to persons entitled to access and on the use and disposition of any information accessed.

Finally, please be advised that Watson intends to obtain final approval of its ANDA and proceed to market its alendronate sodium tablets (5 mg, 10 mg, 35 mg, 40 mg and 70 mg) as soon as permitted by applicable statutes and regulations.

If you have any questions after reviewing this letter, please feel free to contact us to discuss this matter.

Very truly yours,

**LEYDIG, VOIT & MAYER, LTD.**

Steven H. Sklar